NELLIE DEIGHAN *et al. vs.* CATHERINE A. HANAWAY, *Ex.*

JULY 22, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J.   This is an appeal from a decree of the probate court of Pawtucket admitting to probate a certain instrument in writing, dated December 20, 1938, as the last will of Sarah McMann, and appointing Catherine A. Hanaway the sole beneficiary and executrix thereof.  From this decree the appellants took an appeal to the superior court, where a trial resulted in a verdict of a jury that the instrument in question was the last will and testament of Sarah McMann.   The appellants' motion for a new trial was denied by the trial justice.

The case is before us on appellants' bill of exceptions, first, to certain rulings in the course of the trial concerning a genealogical chart which was admitted in evidence as appellee's exhibit B; second, to the denial of certain requests to charge on the issue of undue influence; and third, to the refusal of the trial justice to grant appellants' motion for a new trial.   All their other exceptions were expressly waived by the appellants.

The will in question was executed by Sarah McMann, hereinafter referred to as Sarah, in a hospital in the city of Pawtucket.  The attesting witnesses were Stephen F. Hughes and John F. Quinn, the former a doctor and the latter the attorney who drew the will.  With the exception of a bequest for a reasonable sum for masses, the will leaves Sarah's entire estate to "Catherine A. Hanaway, of Providence, R. I.

in recognition of her Kindness and devotion to me and in recognition of our warm friendship for over forty years, . . . . " Catherine was also named executrix and exempted from furnishing any bond while acting in that capacity.

The testatrix Sarah was about eighty years of age and unmarried at the time of her death on December 21, 1938. She had no immediate relatives and few friends. Her four brothers and one sister, none of whom ever married, had all died by 1929. Prior to the death of her sister in 1922 the testatrix had been employed for many years as a saleswoman in stores in the city of Providence. Thereafter she did not work, but lived alone until the time of her death. The evidence shows, and the appellants do not dispute, that she was of a religious and retiring nature, and lived a somewhat secluded life.

The nine appellants in this case claim to be cousins of the testatrix in the third or fourth degree. Only one of them, Ellen, or Nellie, Deighan, testified. It is clear from the evidence that the testatrix met them rarely, if at all, and that she had no particular love or affection for any of them. In fact, appellants' brief states that: "There is no pretense that these appellants expected anything from Sarah, nor that Sarah expected anything from them." The appellants' sole purpose in this case, according to their brief, was "to prevent any interlopers from victimizing Sarah McMann on her deathbed."

The evidence shows that the appellee Catherine A. Hanaway became acquainted with Sarah while both were employed in adjoining departments in the Boston Store in Providence; that the former, being then a young girl, often ran errands for Sarah and some of the other employees during the first years that the appellee was employed in that store; and that in 1903, while working elsewhere, she married her present husband, James F. Hanaway, who was then and is now employed by the Boston Store. Catherine testi-

fied that she stopped in occasionally at Gladding's to see Sarah during all of the time that the latter was employed there, while Catherine's husband testified that during this same period Sarah frequently stopped at his counter at the Boston Store to ask for Catherine. Apparently neither Sarah nor Catherine visited each other at their respective homes prior to 1928.

Catherine testified that, in March 1928, Sarah called her on the telephone and asked if she, Catherine, "would go up and see her some day"; that she agreed to call on Sarah at an appointed time and that on this first visit to Sarah's home they spent the afternoon together talking about "the times we had in the store, and what good times we had"; that when she was leaving Sarah asked her if she would come out the following Sunday with her husband, which she promised to do and did; that on this occasion Sarah told her that "she was so lonely she didn't know what to do, and she asked me (Catherine) if we would continue coming Sunday"; that thereafter until Sarah was taken to the hospital in 1938 Catherine and her husband visited Sarah practically every Sunday, frequently bringing food out to her and usually helping her with her household duties.

The appellants' claim of undue influence, which we will later consider, involves the conduct of the appellee, of Dr. Hughes, and of a priest. Sarah was well acquainted with both Dr. Hughes and the priest, the former having been her physician for over twenty-five years, while the latter, who had been a curate of her parish for many years before being transferred elsewhere as a pastor, continued visiting her during the last years of her life. Doctor Hughes testified that he saw the appellee twice before Sarah went to the hospital; once when he called at Sarah's home, and again when the appellee accompanied Sarah to his office. His testimony does not show that he had ever met the priest prior to December 20, 1938, the date the will in question was executed. By agreement the priest was not called as a witness.

Following her sister's death in 1922, Sarah lived alone for sixteen years on the first floor of her three-tenement house on East street in Pawtucket. Although advanced in years she was in fairly good health, attending personally to her household duties and to business matters until December 2, 1938, when she fell down the steps leading to the cellar of her home and suffered an injury to her knee. Doctor Hughes was called that day, and upon being told that she must go to the hospital, Sarah, according to the doctor's testimony, turned over her bankbook to him for safekeeping. She also gave him appellee's telephone number and asked him to inform the latter that she, Sarah, was going to the hospital. She went there on December 3, 1938 and on that same day, following her instructions, the doctor called the appellee and told her "to go right up to the hospital, Miss McMann wanted her". It appeared in evidence that while Sarah was at the hospital the appellee visited her every day. She also received some visits from a few other friends and neighbors, but none from the appellants.

In view of Sarah's injury Dr. Hughes consulted Dr. Herbert E. Harris, an orthopedic surgeon, and they attended Sarah until her death from lobar pneumonia at 7:15 o'clock, p. m., on December 21, 1938. It appears in evidence that Sarah's condition changed definitely for the worse on the afternoon of December 19, and that her name was placed on the danger list the following day. About 8 o'clock, a.m., on December 20, Dr. Hughes telephoned this information to the appellee, and she in turn notified the priest, who then drove her in his automobile to the hospital. The appellee testified that they both went to Sarah's room; that after some preliminary conversation between the priest and Sarah, in the course of which she recognized and called them both by name, he asked Sarah "if she would like to fix her affairs and she said yes", whereupon he then asked her: " 'Did you want to see Mr. Quinn?' And she said yes."

John F. Quinn, an experienced member of this bar, testified that he went to the hospital in response to a telephone call from the priest; that he met the latter and the appellee in a waiting room; that while there he saw and spoke to Dr. Harris; that Dr. Hughes then came in and very shortly thereafter he, Dr. Hughes, the priest, and the appellee went to Sarah's room where, after formal greetings, he was introduced to her as "Lawyer Quinn".

Respecting Sarah's mental condition, Quinn testified as follows: "Q. Did she appear at that time to you to be conscious?     A. Yes, indeed. Q. Did she appear to know what was going on? A. Absolutely." In answer to the question "if she wanted to fix up her affairs and make a will" she answered that she did. When asked what property she had she said that "she had money in the bank and a house."

The following testimony of Quinn sets out the instructions which he states he received from Sarah as to how she wanted to dispose of her property in her will: "I asked her what disposition she wanted to make of her property, and she told me she wanted to leave it to Kate Hanaway. I asked her if she wanted any masses said for the repose of her soul, and she said that she did", adding that the priest who was then present, and whom she named, would say masses for her. Quinn further testified: "I asked her how long she had known Kate Hanaway, and she said over forty years. I asked her if Mrs. Hanaway had been good to her, and she said that she had. And not in response to any question of mine, but she said, 'No relatives. No relatives.'" Upon being asked whom she wanted to name as executrix to carry out her wishes and to take care of her affairs, she said: "Mrs. Hanaway"—"Katy Hanaway." The attorney thereupon drew the will in Sarah's room in accordance with these instructions.

When he had finished drafting the will he read it to Sarah and asked her, "if that's what she wanted for her last will

and testament, and she said it was; and she raised her hand, indicating to sign it, and said she wanted to sign it,—just the word 'sign.' " The attorney then placed the will before her on the bed' and she signed it by mark, he and Dr. Hughes acting as attesting witnesses. The attorney retained possession of the will after its execution. In cross-examination he testified that he did not notice any difficulty in Sarah's breathing, although he did notice she spoke slowly and with difficulty, and that at one time he had to speak louder to make her understand.

It also appears in the witness' testimony that he did not know Sarah McMann or the appellee Catherine A. Hanaway before he was introduced to them at the hospital; that although he knew there was a Dr. Hughes in Pawtucket he had never met him until the occasion in question; and that he only knew the priest by name as being connected with a certain parish in that city. The appellants absolved the attorney from any charge of improper conduct, stating, in substance, in their brief that he was "disarmed by the apparent respectability" of those procuring the will.

The testimony for the appellants on the question of undue influence is meager and general. Nellie Deighan testified that on several of the few occasions when she visited Sarah at her home the latter said: " . . . there was somebody after her all the time trying to get her to make a will, and she would get very upset when she would talk about it." On one of these occasions Sarah said that the priest had spoken to her about making a will, "but she said she wasn't going to; when she did a thing like that she would do it of her own free will, and she got very, very upset over it", adding that if she made a will she would remember the White Sisters, who had been good to her and to her sister.

Mrs. Agnes C. Ysebaert, a witness for the appellants, testified that on a visit to Sarah in October 1938, the witness noticed that the buffet had been cleared off and newspapers

spread over it, and that when she asked Sarah what had become of the things that were on the buffet, the latter said that "these people from Providence that come there to visit her always cast eyes around and were always rather covetous of whatever was there, so she had cleared the buffet off to keep temptation out of their way. Q. Did you ever hear her say that she wanted to have the Hanaways around there? A. No, she never mentioned them, before she was sick." This witness met the appellee for the first time in the hospital when they were visiting Sarah. The witness testified that on this occasion Sarah told her, before the appellee came into the room: " . . . this woman from Providence, Mrs. Hanaway, she said, wanted to railroad her into a hospital or a convalescent home in Woonsocket, but she said she wasn't going to go there, she was going to live and die in her own house in Pawtucket." The witness further testified that in the conversation which followed with the appellee, after she came into Sarah's room, the appellee expressed the opinion that Sarah being ill "ought to be in a heated apartment or somewhere, and she knew a nice convalescent home she could go to." The witness then added as an independent statement of her own: "In fact, we talked about that for years, to try to get her to go into a heated apartment."

Mary Williams, who ran a small grocery store near Sarah's tenement, testifying for the appellants, stated that she occasionally delivered groceries to Sarah's home, and that she had seen the appellee there a few times. "Q. Did you ever have any conversation with Miss McMann about Mrs. Hanaway? A. Well, no, any more than she would say, 'Well, I don't see why they are hanging around me for.' "

Nellie B. Noonan, another witness for the appellants, who was employed in a real estate office, testified that she had known Sarah for over forty years and often called on her and assisted her whenever occasion required in matters con-

nected with her real estate. This witness further testified that on one of these visits Sarah told her that she had signed up some broker, at the appellee's suggestion, for the sale of her house, and that she was quite disturbed over what she had done, although she told the witness that she was satisfied with the price she had set. "Q. Did she ever say she was glad to have Mrs. Hanaway around there? A. Well, in the end she said she was getting on her nerves; she wasn't able to have them coming, they were getting on her nerves. Q. And who do you mean by 'they'? A. Mr. and Mrs. Hanaway."

The hospital records in this case show that Sarah McMann was critically ill when she executed her will on the morning of December 20, 1938. Whether she possessed testamentary capacity at that particular time is a question of fact to be determined from all the facts and circumstances in evidence. The credibility of witnesses, especially if they possess medical skill and knowledge, is an important element in such determination. In addition to what may be deduced on this point from the testimony which we have hereinbefore mentioned, Dr. Hughes, who was a witness to the will, testified that Sarah was of sound mind when she executed that instrument. Dr. Harris, Sarah's other attending physician, testified as follows: "Q. While Mr. Quinn and Dr. Hughes and the rector of her church were in the room there, did you have occasion to pass the door of Miss McMann's room? A. I did. . . . Q. Was the door closed or open, Doctor? A. It was partly open. Q. And while you passed the door did you hear any conversation in the room? A. I could hear the men present talking and I could hear the patient talking." The doctor further testified that he visited Sarah within five minutes after the others had left; that at that time she recognized him; that he had some slight conversation with her in the presence of a nurse; and that he believed that Sarah then had sufficient understanding to know the meaning of a will.

To rebut the appellee's evidence of testamentary capacity, the appellants strongly rely upon the testimony of Mary Williams, Nellie B. Noonan and the hospital records. Mary Williams testified that her last visit to Sarah was a few days before the latter died; that at that time Sarah "didn't seem to want to talk at all. She was sleeping. Wanted to be sleeping all the time." The hospital records show that at 2:30, a.m., on December 20, 1938, Sarah's name was placed on the danger list. The will in question was executed between 9:30 and 10 o'clock on that morning. The entries in the progress notes of the hospital record covering that period are as follows: "At 10 o'clock: Seen by Dr. Harris and also patient's own doctor. 10:30: Patient was still not able to recognize her visitors apparently. Seen by a priest. 11 P.M.: Apparently the same condition. 11:30: Pulse is still rapid but of fairly good quality."

Under their first seven exceptions the appellants question rulings of the trial justice admitting in evidence a genealogical chart, permitting questions to be asked concerning such chart, and refusing to strike out testimony so admitted. They contend that there was no proof of the accuracy of said chart, and further that, in any event, appellee's questions in relation thereto were prejudicial in that as a result thereof: "The jury could not fail to be saturated with the idea that the appellants were more or less remotely and not immediately related to Sarah McMann." In his rulings on this point the trial justice indicated that the chart and the testimony in relation thereto had some relevancy on the issue of undue influence, intimating that the omission by the testatrix of distant relations and the preference of a stranger could be more understandable than such omission in favor of a stranger as against persons closely related.

An examination of the papers in the case discloses a motion by the appellee for a bill of particulars, asking the appellants to state in just what respect they and each of

them constituted the heirs of Sarah McMann so as to be entitled to her estate or to any portion thereof, if she died intestate. This motion was granted, and a bill of particulars was furnished by the appellants setting forth a genealogical record in which James Chute and his wife Rose Ann Chute, who died in Ireland about one hundred years and about ninety years ago respectively, appear as the common ancestors. The appellants having thus furnished this information cannot question its accuracy and are bound thereby.

Upon comparing this bill of particulars with the genealogical chart introduced in evidence by the appellants, we find that the chart is an exact reproduction in graphic form of the genealogy set out in the bill of particulars. In these circumstances the chart in question was supported by sufficient proof as to its accuracy to make it admissible in evidence, and also, in our opinion, its admission did not prejudice the appellants in any way. The appellee was not bound to accept Nellie Deighan's statement that she and the other appellants were cousins of Sarah McMann, without further inquiring into the degree of that relationship. This the appellee did by using in graphic form the information which the appellants themselves had given in their bill of particulars. These exceptions are, therefore, without merit and are overruled.

The next exception argued by appellants, relates to certain requests to charge respecting the question of undue influence. At the conclusion of the charge the trial justice, addressing counsel for the respective parties, asked if there were any exceptions, and to this inquiry counsel for the appellants answered in the negative. Immediately thereafter the court gratuitously and of its own motion made the following statement: "Exceptions are noted on behalf of the parties in so far as the Court has failed to charge as requested." We are doubtful whether, on such a record, the appellants are entitled to press the exception now under

consideration; but assuming, without deciding, that they have a valid exception, we find it without merit, for a reading of the whole charge shows that the trial justice adequately and correctly covered the essential elements underlying the issue of undue influence. This exception, therefore, is overruled.

The last exception urged by the appellants is to the denial of their motion for a new trial. Under this exception they argue the testimony at great length in order to establish: First, that they have sustained the burden of proof on the issue of undue influence; and second, that the appellee did not sustain the burden of proof on the issue of testamentary capacity. We cannot agree with the appellants on either of these points. We have referred at length to the testimony in the record before us so that it might fairly appear that the issues presented by the appellants under this exception are issues of fact and not of law. No exception having been taken by them to the charge of the court, the law, as therein stated, is the law of the case. The jury determined the facts adversely to the appellants and the verdict was sustained by the trial justice.

In his decision denying appellants' motion for a new trial the trial justice said: "* * * there was certainly no direct testimony of undue influence, and very little if any testimony from which the jury might reasonably ·infer the exercise of undue influence. And so the Court would say, without hesitating a moment, that so far as the question of undue influence is concerned the jury's verdict is entirely proper and supported by the evidence." A consideration of all the testimony leads us to the same conclusion. The appellants' case, on this issue, is based mainly upon suspicion.

They also contend that the trial justice misconceived and otherwise omitted fairly to consider important features of the evidence in denying their motion for a new trial in relation to the ground of lack of testamentary capacity. In

urging this contention, they rely upon certain incautious yet clearly understandable language used by the trial justice in making his decision when that decision, which he gave from the bench, is taken as a whole. In the course of his decision he refers to the apparent conflict in the evidence, as to Sarah McMann's testamentary capacity, between the entries in the hospital records on the one hand, and the testimony of Doctors Hughes and Harris on the other. He then goes on to say that if he were counsel for the appellants, he would be convinced that this was not Sarah McMann's will, but that if he were counsel for the will, he would be sure that she was able to make it at the time she made it. He concludes his decision in the following language: "This Court cannot say, for the reasons previously stated, . . . that the verdict does justice between the parties. This Court does not know. This Court depends entirely on the testimony, and the Court's interpretation of the testimony; and because this Court believes that medical men are better able to testify concerning the mental capacity of a person at a given moment than persons who are not doctors, the motion for a new trial is denied and an exception is noted."

When the trial justice says, as above stated, that he does not know whether the verdict "does justice" between the parties, we interpret such language as meaning that he was then referring to absolute or abstract justice; and that he was excluding from his own mind such a concept of justice as the test to be applied in passing upon the motion for a new trial. His above-quoted statement clearly shows that, after thus using the word "justice" in a preliminary sense, he immediately states that he must depend "entirely on the testimony" and then proceeds to consider the effect that the evidence had upon his mind in determining where its fair preponderance is upon the issue of testamentary capacity. On one side there was whatever inference might be drawn from the somewhat indefinite entries in the hospital records as to the testamentary capacity of Sarah McMann at the

precise time that she executed her will, while on the other side there was the positive testimony of Doctors Hughes and Harris, whose credibility is in no way questioned by him, that at such time Sarah McMann did possess testamentary capacity. Taking into consideration all the evidence in the case, he concluded that the positive testimony of those witnesses was sufficient for him to say that the appellee had sustained the necessary burden of proof on the issue of testamentary capacity. As we interpret his decision, he applied the correct rule in passing upon the motion for a new trial. We cannot say that he was clearly wrong in his conclusion. The appellants' exception on this point is, therefore, overruled.

All the appellants' exceptions are overruled, and the case is remitted to the superior court for further proceedings following the verdict.

*Thomas L. Carty*, for appellants.

*Woolley, Blais and Quinn, John F. Quinn*, for appellees.